# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

### Before
### THE COURT EN BANC

### UNITED STATES OF AMERICA

v.

### DAVID M. JONES
### LIEUTENANT COLONEL, U.S. MARINE CORPS
### MILITARY JUDGE

### STEPHEN P. HOWELL
### STAFF SERGEANT (E-6), U.S. MARINE CORPS
### REAL PARTY IN INTEREST

### NMCCA 201200264
### Review of Petition for Extraordinary Relief in the Nature of a
### Writ of Prohibition

**Sentence Adjudged**: 29 April 2015.
**Military Judge**: LtCol D. M. Jones, USMC.
**Convening Authority**: Commanding General, Marine Corps
Recruit Depot/Eastern Recruiting Region, Parris Island, SC.
**For Petitioner**: Col Mark Jamison, USMC.
**For Real Party in Interest**: LT R. Andrew Austria, JAGC,
USN.

## 29 December 2015

------------------------------------------------------
## OPINION OF THE COURT
------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

MARKS, J., delivered the opinion of the court in which FISCHER, S.J., HOLIFIELD, J., and CAMPBELL, J., concur. BRUBAKER, S.J., filed an opinion dissenting in part and concurring in part joined by MITCHELL, C.J., KING, J., and RUGH, J.. PALMER, J., did not participate in the decision of this case.

MARKS, Judge:

On 10 August 2015, the Government petitioned for Extraordinary Relief in the Nature of a Writ of Prohibition under the All Writs Act, 28 U.S.C. § 1651. The writ would vacate the military judge's (MJ) ruling directing the convening authority (CA) to provide Staff Sergeant (SSgt) Howell sentencing credit for illegal pretrial punishment from the date his initial conviction was set-aside, 22 May 2014, until his retrial on 29 April 2015. We stayed the post-trial proceedings and now grant the Writ in part and deny it in part.

## I. Background

On 12 October 2012, a general court-martial panel of members with enlisted representation convicted SSgt Howell, contrary to his pleas, of a violation of a general regulation, rape, aggravated sexual contact, forcible sodomy, assault consummated by a battery, and adultery, in violation of Articles 92, 120, 125, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 920, 925, 928, and 934. The members sentenced him to confinement for eighteen years, reduction to pay grade E-1, total forfeitures, and a dishonorable discharge. The CA approved the sentence and, except for the punitive discharge, ordered it executed. SSgt Howell's term of enlistment expired on 26 November 2012 during post-trial confinement.

On 22 May 2014, this court set aside the findings and sentence of that court-martial for apparent unlawful command influence and returned the record to the Judge Advocate General for remand to the CA with a rehearing authorized. *United States v. Howell*, No. 201200264, 2014 CCA LEXIS 321, unpublished op. (N.M.Ct.Crim.App. 22 May 2014). The CA ordered a rehearing on 25 June 2014; SSgt Howell was released from confinement and returned to active duty in a full-duty status the next day. He was permitted to wear his pre-conviction rank insignia of E-6 and assigned commensurate duties. But, in accordance with guidance from the Defense Finance and Accounting Service (DFAS) General Counsel's Office, SSgt Howell was paid as an E-1 while awaiting his rehearing.

On 17 September 2014, SSgt Howell filed a pretrial motion seeking (1) restoration of back-pay from the date this court set aside his sentence until that point and (2) restoration of pay grade E-6 pay until a future sentence to reduction in pay grade. The MJ denied the request to restore forfeited pay as premature under Article 75(a), UCMJ, but ruled that SSgt Howell should be

2

paid as an E-6 pending his rehearing.  The MJ concluded that failure to pay SSgt Howell at pay grade E-6 following set aside of his conviction amounted to illegal pretrial punishment in violation of Article 13, UCMJ.  Acknowledging no authority to order the Government to pay SSgt Howell at pay grade E-6, the MJ instead awarded one day of confinement credit for every day SSgt Howell was paid at pay grade E-1 pending rehearing, from 22 May 2014 onward.  The Government filed a motion for reconsideration, and the MJ affirmed his earlier decision.

On 29 April 2015, a general court-martial panel of members with enlisted representation convicted SSgt Howell, contrary to his pleas, of violating a lawful general order, abusive sexual contact, and adultery, in violation of Articles 92, 120, and 134, UCMJ.  The members sentenced SSgt Howell to confinement for nine years, reduction to pay grade E-1, total forfeitures, and a dishonorable discharge.  Prior to the CA's action, the Government petitioned this court for a stay of post-trial proceedings and the issuance of a Writ of Prohibition to vacate the MJ's ruling on confinement credit.  We granted the stay of post-trial proceedings pending resolution of the petition.

## II.  All Writs Act and Petition for Extraordinary Relief

A.  *Jurisdiction*

By virtue of their Congressionally-prescribed appellate functions, the military courts of appeals have the authority to entertain petitions for extraordinary relief filed under the All Writs Act, 28 U.S.C. 1651(a).  *Dettinger v. United States*, 7 M.J. 216, 219-22 (C.M.A. 1979).  SSgt Howell, the Real Party in Interest, disputes our jurisdiction to consider the Government's petition in this case based on our inability to consider an interlocutory appeal of the same ruling.  Indeed, confinement credit is not an enumerated order or ruling susceptible to Government interlocutory appeal under Article 62, UCMJ.  But the Court of Appeals for the Armed Forces (CAAF) has repeatedly held that Article 62 does not limit this court's authority to consider petitions for extraordinary relief.  *See United States v. Dowty*, 48 M.J. 102, 106-07 (C.A.A.F. 1998) (citing *Dettinger*, 7 M.J. at 219); *see also United States v. Booker*, 72 M.J. 787, 793-96 (N.M.Ct.Crim.App. 2013).  SSgt Howell has offered no precedent to the contrary.

In its petition, the Government cites the unavailability of Article 62 interlocutory review in support of its need for extraordinary relief.  As Judge Effron pointed out in his

concurring opinion in *United States v. Ruppel,* 49 M.J. 247, 254 (C.A.A.F. 1998), the Government's only means to appeal a sentence credit is an extraordinary writ. In *United States v. Suzuki*, 14 M.J. 491, 492 (C.M.A. 1983), the Court of Military Appeals (CMA) expected that a CA would seek an extraordinary writ if it believed an MJ had exceeded his or her authority to award confinement credit. Therefore, we conclude that this court has jurisdiction to entertain the Government's petition.

On petition for extraordinary relief from any party, this court may "issue all writs necessary or appropriate in aid of its jurisdiction and agreeable to the usages and principles of law." RULE FOR COURTS-MARTIAL 1203(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Discussion; *see also* 28 U.S.C. § 1651(a), the "All Writs Act." We conclude this petition, seeking relief from an MJ's award of confinement credit for a violation of Article 13, UCMJ, requests an action in aid of our jurisdiction. We turn now to the standard of review to guide our determination of this writ's necessity or appropriateness.

B.  *Standard of Review*

Traditionally, appellate courts employed extraordinary writs "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943) (citations omitted). The Supreme Court has distinguished a writ from the ordinary appellate court function of identifying reversible errors: "Its office is not to control the decision of the trial court, but rather merely to confine the lower court to the sphere of its discretionary power." *Will v. United States*, 389 U.S. 90, 104 (1967) (citation and internal quotation marks omitted).

Our superior military court has prefaced discussions of extraordinary writs by cautioning, "The writ of mandamus is a drastic instrument which should be invoked only in truly extraordinary situations." *United States v. Labella*, 15 M.J. 228, 229 (C.M.A. 1983).[1]  Reversal of a trial judge's discretionary decision requires that the decision "amount 'to a judicial usurpation of power,' *United States v. DiStefano*, 464

---

[1] Although the extraordinary writ at issue in *Labella* was a writ of *mandamus* instead of a writ of prohibition, the case law does not draw a distinction among the types of extraordinary writs when discussing the standard for granting one. *See e.g. Gray v. Mahoney*, 39 M.J. 299, 303 (C.A.A.F. 1994); *Satterfield v. Drew*, 17 M.J. 269, 274 (C.M.A. 1984).

4

F.2d 845, 850 (2d Cir. 1972) or be 'characteristic of an erroneous practice which is likely to recur.' *Daiflon, Inc. v. Bohanon*, 612 F.2d 1249, 1257 (10th Cir. 1979), *rev'd,* 449 U.S. 33 . . . (1980)." *Id*. (additional citations omitted).

To prevail on a writ of *mandamus*, the CAAF has also required a petitioner to show "(1) there is no other adequate means to attain relief; (2) the right to issuance of the writ is clear and indisputable; and (3) the issuance of the writ is appropriate under the circumstances." *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012) (citing *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004)). Our superior court has emphasized the need for clarity, certainty, urgency, and necessity when wielding the power of the extraordinary writ.

The *Labella* court introduced and defined "judicial usurpation of power" as a judicial decision "amount[ing] to more than even 'gross error.'" 15 M.J. at 229. As for what constitutes an "erroneous practice likely to recur," the Tenth Circuit's opinion in *Daiflon* sheds some light. *Daiflon v. Bohanon*, 612 F.2d 1249 (10th Cir. 1979), *rev'd sub nom Allied Chemical v. Daiflon*, 449 U.S. 33 (1980). Petitioner Daiflon sought an extraordinary writ, contending that a trial judge's order for a new trial "exemplified an erroneous practice likely to recur."[2] *Id.* at 1251. In response, the Tenth Circuit clarified the petitioner's burden: "To obtain relief Daiflon must, of course, demonstrate that its right is clear and indisputable. . . . Daiflon is required to show that the order was not only erroneous under normal standards of appellate review, but also that the ruling is so extraordinary as to evidence arbitrariness and a clear abuse of discretion." *Id.* (citations omitted).

While we cannot trace the "clear and indisputable" language in *Hasan* directly to *Daiflon*, the language recurring in these opinions points us to a definitive standard. Clear and indisputable means there is no debate; any reasonable disagreement has been settled, and a consensus has taken hold. To ignore well-established consensus is to abuse one's discretion and usurp one's judicial power. With this high standard in mind, we turn to the law governing the MJ's decision at issue in this case.

---

[2] Pointing to the trial judge's earlier order of dismissal of their case, which the Court of Appeals for the Tenth Circuit vacated, Daiflon argued the trial judge misunderstood his authority and would likely dismiss their case again. *See* 612 F.2d at 1251.

## III.  Article 13, UCMJ

No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subjected to minor punishment during that period for infractions or discipline.

Art. 13, UCMJ, 10 U.S.C. § 813.[3]

The CAAF has characterized illegal pretrial punishment as "involv[ing] a purpose or intent to punish, determined by examining the intent of detention officials or by examining the purposes served by the . . . condition, and whether such purposes are 'reasonably related to a legitimate governmental objective.'" *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005) (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *United States v. McCarthy*, 47 M.J. 162, 165, 167 (C.A.A.F. 1997)). *See also United States v. Smith*, 53 M.J. 168, 172 (C.A.A.F. 2000) (the Government must identify "a legitimate nonpunitive basis" for placing pretrial restrictions on an accused). In *United States v. Fischer*, 61 M.J. 415, 421 (C.A.A.F. 2005), the CAAF condensed the disjunctive *King* test into "intent to punish or a punitive effect." Without establishing a requirement to do so, the CAAF applied the seven factors from the Supreme Court's opinion in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-169 (U.S. 1963), to help determine whether a law, regulation, or policy exacts a punitive effect: (1) Whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment -- retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

---

[3] This analysis focuses exclusively on the first prong of Article 13. SSgt Howell was released from confinement awaiting his second trial and did not complain of conditions of arrest. There is no evidence of a need for pretrial restraint to ensure presence at trial or disciplinary infractions requiring minor punishment.

Upon finding a violation of Article 13, MJs may award confinement credit as a remedy: "The power of military judges to grant sentence credit for pretrial confinement and restraint tantamount to confinement is a judicially-created remedy, adopted by this Court under our supervisory powers to enforce Article 13, UCMJ." *Ruppel*, 49 M.J. at 254 (Effron, J. concurring) (citing *United States v. Larner*, 1 M.J. 371 (C.M.A. 1976)).

## IV. MJ's Analysis and Conclusions of Law

The deferential standard of review discussed *supra* requires us to examine the MJ's ruling for a usurpation of judicial power or clear and indisputable legal error. Doing so, we find the MJ neither usurped his power nor committed a clear and indisputable error by finding a violation of Article 13 and awarding confinement credit. But we do find clear and indisputable error in his calculation of confinement credit.

A. *MJ's Application of the Article 13 Standard*

The MJ cited *McCarthy* and *Fischer* for the proposition that finding illegal pretrial punishment required evidence of either a Governmental intent to punish or a punitive effect. The MJ acknowledged DFAS's good faith and sense of stewardship, and he ascribed the conflict to a reasonable disagreement about the law. Nonetheless, the MJ concluded that DFAS's policy lacked a legitimate government purpose and inflicted a punitive effect.

While we are under no obligation to apply the *Mendoza-Martinez* factors in this case, they provide a useful framework for identifying any punitive effect of DFAS's policy. *Fischer*, 61 M.J. at 423 (Erdmann, J., dissenting). We can only speculate as to conclusions the MJ might have gleaned from such an analysis, but our analysis supports his finding of punitive effect.

1) <u>Affirmative disability of restraint</u>. Reduction in pay grade involves an affirmative disability or restraint, because the service member receives less money. Admittedly, once a member's pay grade is reduced, affirmative action is required to restore it. DFAS's policy of continuing to pay a member as an E-1 following set aside simply maintains the status quo. But with each disbursement, DFAS makes a determination of a member's pay entitlement. The difference between compensation at a member's original and post-trial pay grades is concrete and

7

quantifiable, and the member's loss of pay pursuant to the policy grows each pay period.

2)  Historical perspective.  Reduction in pay grade has historically been regarded as a punishment, and it remains an authorized punishment under the Uniform Code of Military Justice.  It is imposed most commonly via Article 15, UCMJ, nonjudicial punishment, courts-martial, and pay grade determinations associated with administrative separation for misconduct, often pursued in lieu of court-martial.[4]  *See* R.C.M. 1003(b)(4); Art. 15(b)(2)(D).  DFAS's policy applies only following a court-martial sentence.

3)  *Scienter*.  DFAS's policy only comes into play on a finding of *scienter*, either through a guilty plea at court-martial or a verdict finding criminal *scienter* on the part of the accused.  The policy applies exclusively to service members (1) who were convicted of UCMJ violations at court-martial, (2) whose conviction and/or sentence was set aside, and (3) who face rehearing or retrial upon their CA's renewed probable cause determinations that they committed alleged crime(s).

4)  Retribution and deterrence.  The DFAS policy promotes the same traditional aims of punishment as the punishment of reduction in pay grade itself.  Deprivation of pay to hold a service member accountable for criminal misconduct and the consequential impact to personal finances are well-recognized means to promote the traditional aims of punishment – retribution and deterrence.  DFAS and the dissent point to fiscal law as the rationale behind the policy.  But this justification falls short.  Even sincere belief in the obligation to enforce an order does not shield the enforcer from the consequences of that order.

5)  Application to criminal behavior.  The behavior to which DFAS's policy applies is necessarily a crime.  First,

---

[4] Less common are non-punitive reductions of pay grade for performance problems.  For example, the Navy and Marine Corps provide for non-punitive reduction in pay grade for incompetence.  *See* Military Personnel Manual, NAVPERS 15560D, § 1450-010, CH-11 (13 April 2005); Marine Corps Promotions Manual, Marine Corps Order P1400.32D Ch 2, Volume 2, Enlisted Promotions, Chapter 6, Nonpunitive Reductions (14 June 2012).  The Army permits administrative reduction of pay grade for inefficiency.  *See* Army Regulation 600-8-19, Chapter 10, § III (2 February 2015).  It is also possible to reduce a member's pay grade following discovery of erroneous promotion through administrative error.  *See* Financial Management Regulation, DoD 7000.14-R, Volume 7A, Chapter 1, Table 1-5 Termination or Reduction of Active Duty Pay and Allowances (May 2015).

there must be a court-martial conviction, and an appellate court must set aside all or part of the conviction or sentence. Then, the CA must decide to re-prefer vacated criminal charges, prefer new criminal charges, and/or convene a rehearing on the sentence. DFAS's policy does not apply unless a CA persists in the prosecution of a crime.

6) <u>Alternative purpose</u>. DFAS asserts it withholds pay to comply with fiscal law and legal precedent regarding entitlement to pay following set aside of a court-martial sentence. As previously stated, the agency that enforces a court-martial order cannot disassociate itself from the effects of that order by simply citing its legal obligation to enforce it.

7) <u>Excessiveness</u>. According to the precedent from our superior court, the punitive effect of pay deprivation while awaiting rehearing is not only excessive but unjustified.

We conclude that the MJ did not commit a clear and indisputable error in finding a punitive effect to DFAS's policy. We now turn to the CMA and CAAF case law on which the MJ relied to find an Article 13 violation.

B. *CMA and CAAF Case Law Precedent*

Once a court-martial sentence is set aside and thus invalidated, the Government can no longer execute it. A member's transition from serving a post-trial sentence to awaiting a rehearing on a set aside conviction or sentence has long presented questions for CAs and military courts. As detailed below, our superior court has ruled on how UCMJ Articles, Rules for Courts-Martial, and other federal regulations apply to multiple forms of set aside punishment – confinement, forfeiture, and reduction in pay grade.

The CMA has held that "implicit in ordering a new trial is a change in the accused's status from sentenced prisoner to one awaiting retrial." *Johnson v. United States*, 42 C.M.R. 9, 10 (C.M.A. 1970) (citation omitted). No vestiges of the former court-martial should linger, as:

> "[a]n order granting a new trial reopens the whole case, which then stands for trial de novo, and places the accused in the same position as if no trial had been had." 24 CJS, Criminal Law, § 1511. As stated in *Salisbury v Grimes*, 223 Ga 776, 158 SE2d 412 (1967), the grant of a new trial "wiped the slate

9

clean as if no previous conviction and sentence had existed." *See also Manor v. Barry*, 62 Ariz 122, 154 P2d 374 (1944), and 39 Am Jur, New Trial, § 204, wherein it is declared: 'An order directing a new trial has the effect of vacating the proceedings and leaving the case as though no trial had been had.'

*Id.*

The most conspicuous manifestation of the *Johnson* Court's clean slate requirement is the law regarding confinement. When a sentence to confinement is set aside, the Government must release the accused. Only if R.C.M. 305 and the criteria for pretrial confinement are met can the Government leave the accused in confinement. *See Moore v. Akins*, 30 M.J. 249 (C.M.A. 1990).

Article 75, UCMJ, governs restoration of rights, privileges, and property when a sentence is set aside, but it affects issues of pay in particular. Two military cases involving post-set aside restoration of pay and pay grade are most relevant to our analysis of the MJ's ruling in this case. The first, *Keys v. Cole*, 31 M.J. 228, 230 (C.M.A. 1990), established two important precedents: (1) the military courts' unique jurisdiction to interpret Articles 13 and 75, UCMJ, in the context of military pay and (2) the interpretations themselves.

Specialist (Spec.) Keys filed a petition for extraordinary relief with two complaints: (1) his pay forfeited pursuant to his original sentence had not been restored, and (2) he had not been paid since the expiration of his enlistment period. *Id.* at 230. Presented with arguments invoking UCMJ Articles 13 and 75(a), the CMA commented on its uniquely appropriate jurisdiction, even in the context of military pay:

Moreover, the nature of the claims makes them peculiarly of the sort that is appropriate for this Court to consider. As to the claim for back pay, Keys relies upon an interpretation of various provisions of the Uniform Code of Military Justice and how they apply to a court-martial sentence that has been set aside by an appellate court. This is not the sort of theory that a court in the military justice system ought to defer to administrative processing as a predicate to the court's considering it.

10

*Id.* Early in its *Keys* opinion, the CMA acknowledged "the normal pay channels to retrieve the disputed pay" but asserted its superior expertise and jurisdiction with regard to UCMJ provisions. *Id.* Later, the CMA reiterated that its jurisdiction in matters of pay depended on the implication of a UCMJ provision. *Id.* at 234. Ultimately deciding that Article 75(a) and pay regulations did not support his petition, the CMA referred Spec. Keys to what was then the United States Claims Court to pursue his claim for pay previously forfeited. *Id.*

Addressing Spec. Keys' claims, the CMA divided its opinion into two subheadings, "Return of Forfeited Pay" and "Pay Pending Rehearing." The organization of the opinion reflected the court's bifurcated interpretation of Article 75(a), UCMJ – looking backward vice forward from the point of set aside. Spec. Keys argued that Article 13 compelled the Government to return forfeited pay once the sentence was set aside. *Id.* Citing Article 75(a), the CMA disagreed. However, the court repeatedly suggested that continuing forfeitures post-set aside might violate Article 13. In fact, the CMA cited Article 13 when clarifying its interpretation of Article 75(a):

> It is clear to us that the unambiguous language of this statute implies that, if a new trial or rehearing is ordered, as in this case, all property -- *i.e.* forfeitures -- will *not* be restored until that rehearing is held. Again, of course, this provision would not entitle the United States to *continue* in the interim to withhold pay otherwise due by relying on the forfeiture element of a set-aside sentence. *See generally* Art. 13; *cf. Moore v. Akins, supra.*

*Id.* at 232.

Proceeding to its analysis of "Pay Pending Rehearing," the C.M.A. began:

> If an accused is in pretrial confinement awaiting rehearing, his pay status -- at least insofar as the Uniform Code of Military Justice is concerned -- should be the same as if he had never been tried in the first instance.

*Id.* Like SSgt Howell, Spec. Keys was awaiting rehearing after the Army Court of Military Review set aside the findings and sentence from his prior court-martial. *Id.* at 229. In both cases, their enlistment contracts expired during their initial

11

confinement.  *Id.*  But unlike SSgt Howell, Spec. Keys remained in confinement.  *Id*. at 230.  Had Spec. Keys been released and restored to full duty, his Article 13 argument regarding deprivation of pay might have been successful.  *Id*. at 232-33. Citing DoDPM provisions[5], the CMA concluded that service members beyond their end of active obligated service (EAOS) but restored to full duty status pending a rehearing are entitled to full pay and allowances.  *Id*. at 233.  The remaining question is the pay grade, addressed in the second pivotal case, *United States v. Combs,* 47 M.J. 330, 332 (C.A.A.F. 1997).

In *Combs*, the CAAF held that a command's decision not to restore a newly released service member's rank and pay grade while he awaited rehearing constituted illegal pretrial punishment in violation of Article 13, UCMJ.  The CAAF's opinion ratified the lower court's matter of fact statement that without an approved sentence to reduction in pay grade, a service member is entitled to the privileges and pay of his or her original rank pending a new, approved sentence. *Id*.  The CAAF "agree[d] with the Court of Criminal Appeals that reduction in rank is a well-established punishment, which unlawfully imposed, warrants sentence relief under [Article 13.]"  *Id*. at 333.  Finding "an essentially unrebutted case for sentence relief under Article 13" stemming from this "unlawful demotion," the CAAF awarded 20 months' confinement credit, one month for each month Airman Basic Combs served in a full-duty status as an E-1.  *Id*.

The circumstances of Technical Sergeant (TSgt) Combs's reduction in pay grade differ from those of SSgt Howell's. Following his release from confinement, TSgt Combs's command briefly allowed him to wear his E-6 rank.  *Id*. at 332.  But the command quickly reversed its decision and required him to replace his E-6 rank insignia and identification card with those of an E-1, or Airman Basic.  *Id*.  Airman Basic Combs and SSgt Howell both suffered the financial loss of receiving only E-1 pay.  But unlike Airman Basic Combs, SSgt Howell regained his visible rank and position, wearing an E-6's uniform and performing commensurate duties.  Regardless of the difference in degree of "ignominy" suffered, SSgt Howell still suffered a quantifiable reduction in his pay grade.

In his concurring opinion, Chief Judge Cox asserted that reduction in rank pending rehearing violated Article 13, *per se*.

---

[5] The provisions of DoDPM paragraph 10317, "Term of Enlistment Expires," now appear, substantively unchanged, in the Department of Defense Financial Management Regulation, DoD 7000.14-R, Volume 7A, Chapter 1, paragraph 010402.G, "Term of Enlistment Expires."

Chief Judge Cox discounted the legal arguments for reduction and other restrictions imposed on Airman Basic Combs and focused instead on the unrebutted effect of reduced rank and pay in finding an Article 13 violation: "This case is simple to me. . . . The point is *the fact* that his rank was reduced, not whether such reduction was right or wrong as a matter of law." *Id*. at 334 (Cox, C.J., concurring).

From *Johnson* to *Combs*, our superior court has enforced the Supreme Court's interpretation of every service member's statutory right to pay. Section 204(a) of Title 37, U.S. Code, entitles a member of a uniformed service on active duty to "basic pay of the pay grade to which assigned or distributed, in accordance with their years of service." The Supreme Court upheld this statutory entitlement in *Bell v. United States*, 366 U.S. 393, 401-02 (1961). "If a soldier's conduct falls below a specified level he is subject to discipline, and his punishment may include the forfeiture of future but not of accrued pay. But a soldier who has not received such a punishment from a duly constituted court-martial is entitled to the statutory pay and allowances *of his grade and status*, however ignoble a soldier he may be." *Id*. (emphasis added) (footnote omitted).

C. *Starting Date for Confinement Credit*

In *Keys*, the CMA highlighted the significance of release from confinement and return to full duty status in the DoDPM regulations governing pay after "'Term of Enlistment Expires.'" 31 M.J. at 233. The CMA ultimately concluded that because Spec. Keys never left confinement or returned to full duty, the regulations governing post-enlistment pay prevented restoration of his pay. *Id*. The current version of that pay regulation[6] is substantively unchanged. When a member is confined following court-martial, "pay and allowances end on the date the enlistment expires unless the sentence is completely overturned or set aside . . . . Pay and allowances will not accrue again until the date the member is restored to a full-duty status."[7]

In *Combs*, the CAAF assigned confinement credit as of the date of release from confinement and return to full duty, not the set aside date. 47 M.J. at 334. Defining the parameters of the illegal pretrial punishment, the CAAF limited credit to "the

---

[6] Department of Defense Financial Management Regulation, DoD 7000.14-R, Volume 7A, Chapter 1, section 010402 (May 2015).

[7] *Id*.

13

period of time which [Airman Basic Combs] was on active duty and suffered the ignominy and other harm from this unlawful demotion." *Id*.

In this case, the MJ awarded confinement credit as of 22 May 2014, the date this court set aside SSgt Howell's sentence. The CA ordered a rehearing in his case on 25 June 2014, and SSgt Howell was released from confinement and restored to full duty on 26 June 2014. His enlistment contract had expired on 26 November 2012. *Keys*, *Combs*, and the pay regulations require SSgt Howell be released from confinement and returned to a full-duty status to receive pay past his EAOS. The MJ misattributed the following passage in the *Combs* opinion to CAAF: "*However, he did not have an approved sentence for that misconduct and was entitled to wear the rank of technical sergeant and to be paid in that grade effective as of our October 8, 1992, decision until such time as he had an approved sentence*." *Id*. at 332. This language came from the Air Force Court of Criminal Appeals (AFCCA) unpublished opinion, which was extensively reproduced in the CAAF's opinion. While the CAAF cited AFCCA's conclusion, they credited Airman Basic Combs for his reduction in pay grade as of 20 October 1992, his date of release, not 8 October 1992, the date of set aside. *Id*. at 334. The MJ failed to cite any other support for his contrary conclusion that SSgt Howell should receive credit for reduced pay when no pay was due.

D. *Application of Writ Standard*

Thus the Government has met its burden for a writ of prohibition for the first 35 days of confinement credit but not for the balance from 26 June 2014 until the effective date of SSgt Howell's subsequent court-martial sentence. We find the award of confinement credit from 22 May through 25 June 2014 to be a clearly and indisputably erroneous application of the law to the facts. In awarding confinement credit for the period before SSgt Howell's release and return to full duty, the MJ ignored settled case law and regulation and pointed to no precedent supporting his chosen start date. His disregard of settled precedent evinced an abuse of discretion and usurpation of his judicial power.

The Government has not, however, met its burden for a writ of prohibition for the remaining confinement credit. The MJ did not usurp his judicial power by ruling on SSgt Howell's complaint of illegal pretrial pay deprivation. The dissent argues that the MJ exceeded his authority by entertaining a pay claim, a matter reserved for DFAS and the Article III courts.

14

However, in *Keys*, the CMA explicitly asserted its right to interpret Articles 13 and 75(a), UCMJ, in matters of pay. The CAAF unreservedly exercised the same jurisdiction and awarded Article 13 credit for pay grade reduction in *Combs*. Here, the MJ followed this precedent and respected DFAS's authority over disbursement of pay by limiting his order to the award of confinement credit and declining to issue any orders regarding disbursement of pay. The MJ acted within the same sphere of discretionary power the CAAF inhabited in *Combs*. *See Will v. United States*, *supra*. As such, the Government has failed to prove usurpation of judicial power.

We further find no clear and indisputable error in the MJ's determination of illegal pretrial punishment following restoration to full-duty. The MJ's interpretation of Article 75(a) aligns with the CMA's precedent in *Keys*. The CAAF's precedent in *Combs* and in particular Chief Judge Cox's concurrence accommodates any distinctions in the facts before the MJ. Concluding that the MJ's decision was a product of unquestionably erroneous legal analysis requires ignoring reasonable interpretations of applicable precedent from our superior court.

We need not address the MJ's efforts to distinguish his case from *Dock v. United States*, 46 F.3d 1083 (Fed. Cir. 1995) and *Combs v. United States*, 50 Fed. Cl. 592 (Ct. Fed. Cl. 2001). The decisions of the Federal Circuit, the Court of Claims, and the CAAF leave gaps and seams where reasonable but conflicting legal interpretations can arise. The conflicting interpretations of DFAS and the MJ are evidence of dispute, not clarity. While future statutory amendments or authoritative court interpretations may prove the MJ wrong, the Government cannot prove clear and indisputable error at this time. The MJ's interpretation of relevant, binding case law as it applied to pretrial punishment is reasonable enough to provide him a solid legal foundation from which to withstand a charge of clear an indisputable error.

The Government had no other mechanism with which to challenge the MJ's order of confinement credit and seek relief for the CA. The right to issuance of the writ is clear and indisputable with regard to the first 35 days of confinement credit but not for the balance of credit for the days following release from confinement and return to full-duty status. It would not be appropriate to disregard our superior court's precedent and issue the writ to prevent confinement credit from

15

26 June 2014 onward, but it is appropriate for the first 35 days.  *See Hasan*, 71 M.J. at 418.

## Conclusion

Accordingly, upon consideration of the Petition for Extraordinary Relief in the Nature of a Writ of Prohibition, the Petition is granted in part and denied in part.  A Writ of Prohibition is hereby issued vacating the MJ's award of confinement credit for the period from the set aside of sentence on 22 May 2014 to the last day in confinement on 25 June 2014.  The Petition is otherwise denied.  The stay in post-trial processing is lifted.

Senior Judge FISCHER, Judge HOLIFIELD, and Judge CAMPBELL concur.


BRUBAKER, Senior Judge (concurring in part and dissenting in part):

I agree that if it was proper to award credit under Article 13, UCMJ, such credit should have begun running upon the real party in interest's (real party's) release from confinement.  I thus concur in the portion of the opinion partially granting the writ.  But I would have found it improper to grant any credit here.  Unlike cases relied on by the majority, this case does not implicate punitive actions by command or detention officials——or any other government officials.  It presents, instead, a pure pay entitlement question.  In my view, the military judge misused Article 13 to litigate and remedy the correctness of an agency's good faith pay entitlement determination.  This conflicts with express Congressional intent that such controversies are within the exclusive jurisdiction of designated Article III courts.  Extraordinary relief is appropriate because the military judge's ruling is an unwarranted intrusion into those courts' province, fails to accord due respect to an agency pay determination, and is bound to recur.  I thus respectfully dissent from the portion of the opinion partially denying the writ.

The entire analysis of the military judge——and the majority——regarding the applicability of Article 13 crumbles if the real party was not entitled to pay at pay grade E-6 while pending a rehearing.  The United States Court of Appeals for the Armed Forces (CAAF) has been consistent about this simple premise: it is not illegal punishment to withhold pay from a

16

service member to which he is not statutorily entitled. *United States v. Fischer*, 61 M.J. 415, 419-20 (C.A.A.F. 2005); *United States v. Allen*, 33 M.J. 209, 215 (C.M.A. 1991). So if the real party was entitled only to E-1 pay, failing to pay him at the E-6 rate could not by itself be punishment—by whatever analysis or factors one may apply.

The central question the trial court faced, then, was the correctness of Defense Finance and Accounting Service's (DFAS) pay determination—that is, litigation over whether the United States owed the real party more pay. The pleadings and rulings made no pretense about this. The real party's pleading was, after all, a "Motion for Appropriate Relief (Restore Pay Grade and Back Pay)."[1] And the military judge began his "Analysis and Conclusions of Law" right out of the box by posing the pay entitlement question—"*Is the Accused entitled to pay at the E-6 rate while he is pending re-trial?*"—then answering it—"*YES.*"[2] He even conceded that "[t]he dispute centers on how to interpret the law regarding at which rank the Accused should be paid pending his rehearing."[3]

Such disputes belong in Congressionally-designated Article III courts. Our superior court has explained:

> In the Tucker Act, 28 [U.S. Code] § 1491 (1982), Congress made such matters exclusively the province of the United States Claims Court or, where appropriate, the Federal District Courts, 28 USC § 1346. *Cf. Bell v. United States*, 366 U.S. 393, 81 S. Ct. 1230, 6 L. Ed. 2d 365 (1961). We have recently reaffirmed our position that such claims must be placed before those fora in view of their particular expertise in dealing with claims for pay. *Keys v. Cole, supra; accord* B-189465, 57 Comp. Gen. 132 (1977) (decisions of United States Court of Military Appeals strictly limited to matters of military justice and do not extend to status of servicemember's pay).

*Allen*, 33 M.J. at 215-16; *cf. Keys v. Cole*, 31 M.J. 228, 234 (C.M.A. 1990) ("[W]e hesitate . . . to interpret military-pay regulations under circumstances where there is another court whose expertise is in that area of the law."). *See also Jan's*

---

[1] Appellate Exhibit II at 1.

[2] AE X at 6.

[3] *Id*.

17

*Helicopter Serv. v. FAA*, 525 F.3d 1299, 1304 (Fed. Cir. 2008).

The Court of Federal Claims not only had jurisdiction over the real party's complaint, but, if it ruled in his favor, adequate remedies. *See* 28 U.S. Code § 1491(a)(2) (the Court of Federal Claims "may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records . . . ."). In fact, the remedies available to the Court of Federal Claims would have been far more apt than the only remedy in a military judge's arsenal: ordering early release from a lawfully-imposed prison sentence.

Perversely, the majority's opinion gives those in the real party's position a disincentive to bring the issue to the court that could rule authoritatively on the substantive pay question and, if appropriate, *directly* remedy the purported pay shortage. As I address further below, the Court of Federal Claims may well be cool to the real party's assertion that, contrary to the agency determination, there is Congressional authorization to pay him at the grade of E-6 while pending a rehearing. So why would a future litigant take his chances before that court when this court—a military court of criminal appeals—has found it appropriate to grant confinement credit under the circumstances? Nearly a year of credit, as awarded here, is a powerful incentive to avoid the Court of Federal Claims and instead litigate the pay entitlement question before a court-martial.

The United States Court of Appeals for the Federal Circuit has spoken forcefully about analogous efforts to avoid the Court of Federal Claims' exclusive jurisdiction:
> This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims. . . . The circuits have consistently rebuffed such blatant forum shopping to avoid adequate remedies in an alternative forum.

*Consol. Edison Co. of N.Y. v. United States*, 247 F.3d 1378, 1385 (Fed. Cir. 2001) (citations omitted).

The military judge's ruling also bypasses the Secretary of Defense's expressly delegated authority to settle such claims administratively. In 31 U.S. Code § 3702(a) Congress directs that, except as otherwise provided by law, the Secretary of Defense shall settle claims involving uniformed service members'

18

pay and allowances.  Under this authority, for instance, the Secretary has established the Defense Office of Hearings and Appeals (DOHA), an administrative body with authority to consider appeals from initial determinations and to affirm, modify, reverse, or remand the determination.  32 C.F.R. 282; DoD Instruction 1340.21 (May 12, 2004).  Decisions from DOHA carry the weight of a formal administrative adjudication and are reviewed under a highly deferential "arbitrary and capricious" standard.  *Miglionico v. United States*, 108 Fed. Cl. 512, 523 (Fed. Cl. 2012).

A court-martial ruling on the correctness of a pay determination as here thus is contrary to express Congressional intent for such disputes to be settled either administratively by the Secretary of Defense or judicially by a designated Article III court.  I see no indication that Congress intended Article 13 as offering an alternative forum to litigate good faith agency pay determinations in a court-martial.

This is not to imply that a court-martial is stripped of its responsibility to address, in appropriate cases, whether a deprivation of pay constitutes illegal pretrial punishment in violation of Article 13.  But this court should require a disciplined approach to this analysis, strictly remaining within the sphere established by Article 13 jurisprudence, while mindful and respectful of the spheres occupied by executive agencies and duly designated Article III courts.  Otherwise, left unchecked, lower courts may be tempted to use Article 13 to grant relief for matters over which they lack jurisdiction and competence.  *See, e.g., United States v. Reinert*, No. 20071195/20071343, 2008 CCA LEXIS 526, *37-38 unpublished op. (Army Ct.Crim.App. 7 Aug 2008) ("nothing in Article 13, UCMJ, or any other article of the Code, authorizes a military judge to sanction illegal pretrial punishment outside the bounds of the court-martial over which he presides.").

The military judge, rather than respecting the sphere occupied by Article III courts while analyzing an Article 13 claim, cast aside their rulings when inconsistent with his own reading of pay regulations and statutes.  *See, e.g.,* AE X at 10 ("To the extent that the *Dock* Court[4] rules that Article 75(a) is an 'entitlement to pay provision' vice a 'restoration' provision, this Court *rejects* that proposition.") (emphasis added).

---

[4] Referencing *Dock v. United States*, 46 F.3d 1083 (Fed. Cir. 1995).

19

DFAS's interpretation is also entitled to respect. DFAS operates under the statutory auspices of 10 U.S. Code § 191. Under this authority, the Secretary of Defense designated DFAS as the single agency within the Department of Defense (DoD) responsible for "providing finance and accounting services and monitoring compliance with all statutory and regulatory requirements within its functional area." DoD Directive 5118.05, ¶4 (Apr. 20, 2012). Even if under this scheme, DFAS's determination does not merit the full measure of deference accorded an administrative agency acting within an express Congressional delegation, *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), it surely is owed at least the level of respect envisioned in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Yet the military judge accorded it none, stating, "the Court does not believe that the government is acting in complete disregard for the rights of the Accused on an issue for which there can be no reasonable debate. Rather, *DFAS and the Court simply disagree* on what rank the Accused should be paid at pending his re-trial."[5]

Proper application of Article 13—one according due respect to DFAS's determination and Article III courts with authority over pay questions—does not start by deciding a pay matter over which the court has no expertise or jurisdiction, then cloaking a remedy under Article 13 to circumvent the court's lack of jurisdiction. It begins, instead, by assessing whether a restriction or condition resulted from an intent or purpose to punish, determining the latter by "examining the purposes served by the restriction or condition, and whether such purposes are 'reasonably related to a legitimate governmental objective.'" *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005) (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)) (additional citation omitted).

As the military judge found, Government officials had no intent to punish the real party. Indeed, command authorities did everything in their power to comply with the law and to remove all adverse consequences resulting from the original conviction and sentence. The pay entitlement question was the one matter over which they had no power. And DFAS, as the military judge found, took a good faith position they believed was backed by statutory and competent judicial authority that

---

[5] AE XLV at 5 (emphasis added). While the military judge uses the term "rank" here, "pay grade" would be more accurate. As I explain later, these are not coterminous and the distinction matters.

20

there was no fiscal authority to pay the real party at his former grade.

This squarely differentiates this case from *United States v. Combs*, 47 M.J. 330 (C.A.A.F. 1997). There, command authorities stripped the appellant of his rank, ordering him to remove his rank from his uniform and to secure a new identification card showing him in the grade of E-1 and forbidding him from wearing his previous rank. *Combs*, 47 M.J. at 331. In its opinion, a plurality of the CAAF included a long block quote from the lower court's unpublished opinion, including a claim that the appellant was "entitled to wear the rank of technical sergeant and to be paid in that grade . . . ." *Id*. Without specifically endorsing this claim, the plurality concluded that the appellant's affidavit was "unrebutted and unequivocally established the *punitive intent of command authorities* towards this servicemember." *Id.* at 332 (emphasis added) (citations omitted). Based on this, it found that the appellant was entitled to confinement credit for the period of time that he "suffered the ignominy and other harm from the unlawful demotion" while pending a rehearing. *Id.* at 334.

Here, in contrast, there is not a shred of evidence of punitive intent by command authorities—as both the military judge and the majority acknowledge. Command efforts not to punish the real party included allowing him to wear and present himself in the *rank* of Staff Sergeant. He was thus freed of the ignominy suffered by Technical Sergeant Combs. And the decision to pay him at the E-1 rate was no mere local command decision. It was a good-faith agency determination based on a DoD-wide policy that there was no statutory authorization to pay the real party at the E-6 rate.

Even if one can read the plurality's opinion as substantively ruling that Combs was entitled to be paid at the E-6 rate while pending a rehearing—a dubious proposition—this was directly undermined by the very court with jurisdiction to determine such matters. In *Combs v. United States*, the Court of Federal Claims held that "[g]iven the fact that [Article 75], as interpreted by the *Dock* court, clearly operates to entitle plaintiff only to E-1 pay, any decision of a prior court awarding him E-6 pay would be clearly erroneous." 50 Fed. Cl. 592, 604 (Fed. Cl. 2001) (footnote omitted). It went on to note that the CAAF, while lacking jurisdiction over pay matters, does have jurisdiction over whether Article 13 was violated and that it may find a violation based on factors beyond a pure pay entitlement question, such as when a command takes a lawful

21

action but is motivated by a punitive intent.  *Id*. (citing *United States v. Washington*, 42 M.J. 547, 562 (A.F.Ct.Crim.App. 1995).  To contrast, this case *does* involve a pure pay entitlement question, and there is no indication that command authorities were motivated by punitive intent.  The military judge's——and the majority's——reliance on the CAAF's decision in *United States v. Combs*, then, is misplaced.

*Analyzing Punitive Purpose*

The key to assessing punitive purpose is not whether a military criminal court *agrees* with DFAS's interpretation, but whether in making the determination, DFAS was pursuing a legitimate governmental interest.  That interest——adherence to fiscal law and only paying claims to which the recipients are positively entitled——is more than legitimate.  It is mandatory.  DFAS is not free to pay a service member based on what a military judge might deem *fair* or *equitable* or even right in his own mind.  Indeed, DFAS is statutorily *prohibited* from making or authorizing an expenditure unless expressly authorized by law.[6] That authorization derives from Congressional statutes, not rulings by a military criminal court.  *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424-25, 432 (1990) ("'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress'" and "'not a dollar of [the Treasury] can be used in payment of any thing not thus previously sanctioned.  Any other course would give to the fiscal officers a most dangerous discretion'") (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) and *Reeside v. Walker*, 52 U.S. 272 (1851)).  *See also Dock*, 46 F.3d at 1086.

Of course, the legitimacy of the governmental interest would be undermined if the pay determination were unreasonable or plainly contrary to controlling fiscal law.  That is not the case here.  DFAS's interpretation is, instead, a faithful and reasonable reading of Article 75(a) as interpreted by courts with competent jurisdiction over fiscal law matters.  The Court of Federal Claims in *Combs*, applying the principles of *Dock*, 46 F.3d at 1087-88, rejected the claim that Combs was entitled to pay at the E-6 rate while a rehearing on his court-martial was pending.  Because the original sentence and the sentence on rehearing both included reduction to pay grade E-1, he was entitled to pay only at the pay grade of E-1.  *Combs*, 50 Fed.

---

[6] 31 U.S. Code § 1341 ("No money shall be drawn from the Treasury, but in consequence of Appropriations made by Law.") ("Anti-Deficiency Act").  Officials who violate the Act face administrative discipline and criminal sanctions, including fines and imprisonment.  31 U.S. Code §§ 1349, 1350.

Cl. at 600. The Court of Federal Claims stated explicitly that Combs' "only right to pay is what Congress has given him, and in this case, Congress clearly has said, with [Article 75(a)], that [Combs] is entitled to the E-1 rate only." *Id.* at 605 (citation omitted).

Without straying into the Court of Federal Claims' lane and prognosticating on how it would rule on this matter during the pendency of a rehearing vice after it, it should suffice to say that DFAS had a legitimate governmental interest in determining that *Dock* and *Combs*, read together, indicate a lack of fiscal authority to pay the real party at the E-6 rate. A court-martial simply is not the proper venue to litigate the correctness of this good faith, reasonable agency interpretation of fiscal law. As the CAAF said in *Fischer*, "[i]f Appellant takes issue with the propriety of the underlying decisions as a matter of fiscal law, he must pursue that issue before the United States Court of Federal Claims." 61 M.J. at 421.

*Analyzing Punitive Effect*

I agree with the majority that it is uncertain that the military judge was required to apply the factors enunciated in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963)[7], but I disagree that, assuming they apply, application of those factors supports the military judge's conclusions. I would analyze the factors as follows:

1.   <u>Affirmative Disability or Restraint</u>. Not paying a service member pay to which he is not entitled is not an affirmative disability or restraint. *Fischer*, 61 M.J. at 419-20 ("it is difficult to characterize this as an affirmative disability because Appellant, and those in his position, are not entitled to be paid.") (citation omitted). Also, the nature of a reduction in pay grade is different from uncollected forfeitures. Once a reduction is effected, the service member is permanently assigned the lower pay grade absent an affirmative promotion or restoration to the previously-held grade. But forfeitures are collected—and thus executed—one paycheck at a time.

2.   <u>Historical Perspective</u>. While reduction in pay grade itself is historically regarded as punishment, paying the real

---

[7] *See Fischer*, 61 M.J. at 419 ("Our court has not previously applied the *Mendoza-Martinez* factors in the context of conducting a review under Article 13. Assuming, without deciding, that the *Mendoza-Martinez* factors are applicable . . . .").

23

party at the pay grade to which entitled cannot be so regarded. *Id.* ("Where Appellant was not entitled to payment, nothing could have been forfeited.")

3.  <u>Scienter</u>.  DFAS's policy is triggered by objective facts: a court-martial sentence including reduction in pay grade; a subsequent decision setting aside the sentence with a rehearing authorized; and a convening authority's action ordering a rehearing.  It applies to a class of people with no consideration given to the service member's state of mind or consciousness of wrongdoing.

4.  <u>Retribution and Deterrence</u>.  The policy attempts only to effect Congressional intent as interpreted by courts of competent jurisdiction on a pay entitlement based on neutral facts.  Particularly given that the pay entitlement did not affect the real party's *rank* of Staff Sergeant and the respect and other privileges attendant to that rank, the policy did not promote retribution and deterrence.

5.  <u>Application to Criminal Behavior</u>.  The behavior to which the policy applies——pending a rehearing on a set-aside sentence, whether or not the underlying guilt is sustained——is not already a crime.

6.  <u>Alternative Purpose</u>.  As discussed above, a powerful alternative purpose to which the policy may rationally be connected is assignable: adherence to fiscal law.  Paying a service member only as authorized by Congress is mandatory and cannot be viewed as punishment.

7.  <u>Excessiveness</u>.  An accused in this position continues to receive full pay and allowances, albeit at the E-1 pay grade.  If that is all he is entitled to, it cannot be viewed as excessive.

Thus, assuming that the *Mendoza-Martinez* factors apply, they lead to the conclusion that DFAS paying the real party in accordance with its good-faith interpretation of fiscal law did not have a punitive effect.

*Misconceptions in the Military Judge's Analysis*

Finally, I wish to address three misconceptions in the military judge's analysis:

1.  The real party's performance of Staff Sergeant duties entitled him to E-6 pay.  It did not.  "A member's pay is defined by act of Congress and is not a *quid pro quo* for

24

services rendered to the military." *Dock*, 46 F.3d at 1086. Rank and pay grade, moreover, are closely associated but not coterminous. Entitlement to pay at one pay grade and authorization to wear a higher rank is not foreign to the military. Frocking of enlisted personnel in the Marine Corps exemplifies an administrative authorization to do just that.[8] Command authorities allowing the real party to wear Staff Sergeant and to perform commensurate duties to avoid the ignominy of a reduction does not equate to fiscal authorization to pay him at the E-6 rate.

2. Paying the real party at the reduced rate is offensive to the Constitutional presumption of innocence. First, DFAS's interpretation required no adverse presumption: by their reading, because there is no positive Congressional authority otherwise, an accused is *not* entitled to pay at the higher grade *unless* the rehearing fails to include a sentence of reduction in pay grade. This is no different from withholding already-collected forfeitures of pay. Second, this was a pretrial, administrative determination. As the Supreme Court said in the context of pretrial confinement, "[t]he presumption of innocence is a doctrine that allocates the burden of proof in criminal trials . . . . Without question, [it] plays an important role in our criminal justice system. . . . But it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun." *Wolfish*, 441 U.S. at 533. Likewise, the presumption of innocence, crucial to an accused's right during the trial to sit silent and require the Government to prove his guilt, has no application to a pretrial administrative determination regarding his pay entitlement.

3. The military judge found that a DoD regulatory provision[9] was "exactly on point"[10] and favored the real party—despite the provision facially pertaining to forfeitures, not reduction in pay grade. DoD pay regulations treat these two distinct punishments distinctly.[11]

---

[8] Marine Corps Order P1400.32D, paragraph 4500.

[9] DoD 7000.14-R (DoDFMR), Vol. 7A, Chapter 48, Section 480802.A.

[10] AE X at 8.

[11] *See, e.g.,* DoDFMR 4803 and 480801.

*Appropriateness of Extraordinary Relief*

The military judge's misapplication of Article 13 to settle a pay dispute was more than gross error. It strayed from the limited jurisdiction of a court-martial, *see Denedo v. United States*, 66 M.J. 114, 134 (C.A.A.F. 2008) and Article 18, UCMJ ("general courts-martial have jurisdiction to try persons subject to this chapter for any offense made punishable by this chapter . . . ."), and into the special province of Article III courts Congressionally empowered to settle controversies over military pay. 28 U.S. Code § 1491.

If allowed to stand, this erroneous use of Article 13 is also likely to recur. DFAS must look to positive law—Congressional statutes as interpreted by courts of competent jurisdiction over pay matters—to determine pay entitlements. Decisions of this or any criminal court cannot create authorization to pay those pending a rehearing at a certain pay grade. So we have a stand-off: Article I criminal courts on one side, holding that persons pending a rehearing are entitled to pay at their previously held pay grade and to sentence relief if paid otherwise; and an executive agency on the other, faithfully applying competent fiscal authority to find the opposite: that such payments are not authorized by the law. Because DFAS cannot change its policy based on a criminal court ruling, its policy must continue. Future litigants in the real party's position, naturally, will continue to seek confinement credit rather than placing the substantive question before the court with legitimate authority to answer it. Under these circumstances, I would find that issuing the writ is necessary "to confine the lower court to the sphere of its discretionary power." *Will v. United States*, 389 U.S. 90, 104 (1967).

Chief Judge MITCHELL, Judge KING, and Judge RUGH join.

For the Court

R.H. TROIDL
Clerk of Court

26